USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: May 10, 2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                            :

CLARIDGE ASSOCIATES, LLC, *et al.*,     :
                            :

                 Plaintiffs,    :       15 Civ. 4514 (KPF)
                            :

              v.            :      <u>OPINION AND ORDER</u>
                            :

ANTHONY SCHEPIS, *et al.*,         :
                            :

                Defendants. :
                            :
------------------------------------------------------X

KATHERINE POLK FAILLA, District Judge:

      This proceeding is but one of more than a dozen actions arising from the failed relationship between the limited partners to an investment partnership on one side, and the individuals who own and control the partnership's general partner on the other. Plaintiffs Leslie and Lillian Schneider, Claridge Associates, LLC, and Jamiscott, LLC brought this action against Defendants Anthony Schepis, Frank and Ruth Canelas, and Northeast Capital Management, LLC, alleging breach of fiduciary duty, unjust enrichment, promissory estoppel, and conversion. Defendants now move to dismiss Plaintiffs' Complaint in its entirety, asserting, *inter alia*, *res judicata* as an affirmative defense. For the reasons detailed in this Opinion, Defendants' motion is granted in part; the remaining case is compelled to arbitration and stayed pending the arbitrator's determination of the scope of the arbitration clause at issue in this case.

# BACKGROUND[1]

## A.    Factual Background

Entity Plaintiffs Claridge Associates, LLC ("Claridge"), and Jamiscott, LLC ("Jamiscott"), are both Delaware limited liability companies owned and managed by family members of Individual Plaintiffs Lillian and Leslie Schneider (the "Schneiders," and together with Claridge and Jamiscott, "Plaintiffs"). (Compl. ¶¶ 11-14).  In 2007, Plaintiffs invested a total of $7 million in the Pursuit Capital Management Fund I, L.P. (the "Fund") and entered into the Limited Partnership Agreement (the "LPA"), which was signed on behalf of the Fund's General Partner by the General Partner's individual managers.  (*Id.* at ¶ 21; Coleman Decl. Ex. A).  At that time, Pursuit Capital Management, LLC ("PCM") served as the Fund's General Partner, and was itself owned, managed, and controlled by Defendants Anthony Schepis and Frank Canelas.  (Compl. ¶¶ 2, 22).  Defendant Ruth Canelas is the wife of Frank Canelas.[2]

---

[1]   This Opinion draws on facts from Plaintiffs' Complaint and the exhibits attached thereto (Dkt. #1), which are taken as true for purposes of this motion.  *See Faber* v. *Metro. Life Ins. Co.,* 648 F.3d 98, 104 (2d Cir. 2011) (when reviewing a complaint for failure to state a claim, the court will "assume all well-pleaded factual allegations to be true" (internal quotation marks omitted)).  Additional facts are drawn from documents relied upon by or integral to the Complaint; these are attached as exhibits to defense counsel's declaration, and are referred to as "Coleman Decl. Ex." (Dkt. #43).  *See Chambers* v. *Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002).  For convenience, the brief filed by Defendants in support of their amended motion to dismiss (Dkt. #42) will be referred to as "Def. Br."; Plaintiffs' opposition (Dkt. #49) as "Pl. Opp."; and Defendants' reply brief (Dkt. #51) as "Def. Reply."

[2]   The Complaint is curiously bereft of factual allegations regarding Ruth Canelas and, despite Plaintiffs' assertion of breach of fiduciary duty against her, she is not alleged to have had any role in the management or control of the Fund's General Partner. Accordingly, unless otherwise specified, references to "Canelas" in this Opinion are to Frank Canelas.

As of 2009, the Fund had ceased making investments and had entered "run-down mode," with only three remaining groups of investors: Plaintiffs, an investment group named Alpha Beta, and "insiders affiliated with Schepis and Canelas." (Compl. ¶ 25).  Over the next three years, it is alleged, Schepis and Canelas refused to provide Plaintiffs with financial information regarding the Fund, ultimately leading Plaintiffs to file a Statement of Claim against PCM with the American Arbitration Association (the "AAA") on May 11, 2012.  (*Id.* at ¶¶ 26-27).  The Statement of Claim contained a multitude of accusations, including that:

> (i)    PCM permitted insiders to purchase an airplane owned by the Fund for insufficient consideration and via an unfair process (the "Airplane Claim");
>
> (ii)    The Fund's parent-entity had sold a claim against Lehman Brothers, the proceeds of which should have gone entirely to the Fund; but that the Fund instead only received 90 percent, with the remaining 10 percent going to an offshore sister fund run by insiders (the "Lehman Split Claim");
>
> (iii)    PCM improperly inflated its incentive fee on Plaintiffs' interest in the Fund (the "Incentive Fee Claim");
>
> (iv)    PCM improperly purported to terminate Plaintiffs' interest in the Fund;
>
> (v)    Monies held in reserve by PCM should have been released to Plaintiffs;
>
> (vi)    Plaintiffs were entitled to an accounting from PCM;
>
> (vii)    PCM mishandled litigation of a claim that the Fund held against UBS; and
>
> (viii)    PCM acquiesced in the excessive marking-up of the price of certain securities bought on the Fund's behalf, some of which were the subject of the UBS Litigation (the "Mark-Up Claim").

(*Id.* Ex. 4; Ex. 5 at 3-4; Ex. 8 at 9).  Additionally, Plaintiffs claim to have learned for the first time at a March 2013 hearing that Schepis and Canelas had "directed the secret transfer on the eve of the arbitration of $645,000 in disputed funds from the Pursuit Fund to [PCM], and then onto themselves and Ruth Canelas." (Compl. ¶ 36, Ex. 5 at 32).  Plaintiffs assert that counsel for PCM had previously assured them that those funds, which represented the disputed incentive fee, would not be transferred prior the arbitrator's ruling on Plaintiffs' Incentive Fee Claim, and, further, that Plaintiffs had declined to seek injunctive relief in reliance on that representation.  (*Id.* at ¶ 36).

On September 27, 2012, PCM notified Plaintiffs that they "were being mandatorily withdrawn from the Partnership" due to their filing of a claim for arbitration, and that they consequently no longer had any rights as limited partners or interest in the Fund.  (Compl. Ex. 5 at 32).  Plaintiffs dispute the validity of this purportedly "mandatory" withdrawal.  (*Id.* at ¶¶ 56-59).

The arbitration proceeded in two phases and yielded two separate awards, each of which was memorialized in a lengthy decision from the arbitrator.  (Compl. ¶ 32).  The Phase I Award, issued on June 5, 2013, found that (i) PCM was liable to Plaintiffs on the Airplane Claim, the Lehman Split Claim, and the Incentive Fee Claim, resulting in an award of $1,196,783.39, plus interest; (ii) the $1,186,346.38 that was being held by PCM in reserve should be returned to Plaintiffs; (iii) Plaintiffs retained their limited partnership interests in the Fund; and (iv) Plaintiffs were entitled to sanctions against PCM in the amount of $192,633.20.  (*Id.* Ex. 5 at 56-57).  The Phase II Award,

issued on December 19, 2013, found PCM liable to Plaintiffs on the Mark-Up Claim and accordingly awarded Plaintiffs a total of $2,224,846.11, representing both damages and a sanction, plus interest and $58,868.75 in attorneys' fees. (*Id.* Ex. 8 at 50).  The New York State Supreme Court (Kenney, *J.*) confirmed both Awards on March 20, 2014, entering judgments the following day (the "March 21 Judgments") that (i) held PCM liable for a total of $4,999,401.22 in damages; (ii) required that the Fund release $1,186,346 of Plaintiffs' improperly withheld assets; and (iii) ordered an accounting.  (*Id.* at ¶¶ 44-45).  That same day, PCM filed a Chapter 7 petition in the United States Bankruptcy Court for the District of Delaware.  (*Id.* at ¶ 48).  As of the filing of the instant matter, PCM had not complied with any part of the March 21 Judgments.  (*Id.* at ¶ 45).

In September 2013, Plaintiffs obtained a restraining order (the "Restraining Order") in New York State Supreme Court to protect the $1,186,346 of Plaintiffs' assets that remained in the Fund.  (Compl. ¶ 51).  The Restraining Order prohibited PCM from (i) transferring Fund assets to itself or its affiliates, owners or principals, or family members of its owners or principals, and (ii) transferring any Fund assets at all if, as a result, the assets left in the Fund would equal less than $1,186,346.  (*Id.*).

Plaintiffs allege that in February 2014, prior to the entry of the March 21 Judgments, Schepis and Canelas formed Defendant Northeast Capital Management, LLC ("Northeast"), and, without the limited partners' notice or consent, replaced PCM with Northeast as the Fund's General Partner.  (Compl. ¶¶ 46-47).  Plaintiffs state that "Northeast is owned, managed and controlled by

Schepis and Canelas; it is headquartered, managed and operated out of the same office location as [PCM] ... [; and] the only difference between Northeast and [PCM] is the sign on the door." (*Id.* at ¶ 49).

On April 29, 2014, at a creditors' "341 Hearing" related to PCM's bankruptcy action, Schepis and his counsel vouched that the September 2013 Restraining Order would be respected, and that the Fund's assets would consequently not be transferred. (Compl. ¶ 53). *See* 11 U.S.C. § 341 (providing for meeting of creditors and trustee). Nevertheless, Plaintiffs contend that on June 30, 2014, Canelas, "with the knowledge and/or participation of Schepis and Northeast," secretly transferred the restricted funds to "the escrow account of counsel for other entities controlled by Schepis and Canelas in the separate UBS Litigation." (Compl. ¶ 54).

Finally, Schepis and Canelas continue to deny that Plaintiffs remain limited partners in the Fund. (Compl. ¶ 58). As a result, Plaintiffs have "been forced to seek to intervene in the UBS Litigation at great cost and expense, simply to protect their already judicially determined interest in that asset of the Pursuit Fund." (*Id.* at ¶ 60).

## B.   Procedural Background

Plaintiffs filed their instant Complaint on June 10, 2015, alleging breach of fiduciary duty against all Defendants; unjust enrichment against Schepis, Canelas, and Ruth Canelas; promissory estoppel against Schepis, Canelas, and Northeast; and conversion against Schepis and Canelas. (Dkt. #1). On September 25, 2015, Defendants filed a motion to dismiss or, alternatively, to

6

compel arbitration.  (Dkt. #26, 27).  In response, Plaintiffs submitted a letter to the Court stating that in light of Defendants' apparent agreement that this matter properly belongs in arbitration, the Court should simply compel arbitration.  (Dkt. #30).  Following an October 22, 2015 telephone conference to clarify the parties' respective positions regarding the necessity of arbitration, and subsequent communications indicating that the parties had failed to represent the record accurately in their submissions, the Court gave the parties leave "to file revised papers in connection with Defendants' motion, in order to ensure that their submissions are scrupulously faithful to the record in each of the related proceedings."  (Dkt. #37).

Defendants filed their amended motion to dismiss on November 16, 2015, this time omitting any request for arbitration.  (Dkt. #41, 42).  Plaintiffs filed their brief in opposition on January 5, 2016 (Dkt. #49), and Defendants concluded the briefing with their reply on January 21, 2016 (Dkt. #51).

On April 25, 2016, Defendants submitted a letter notifying the Court that Plaintiffs had filed a substantively identical complaint as an adversary proceeding in PCM's Chapter 7 bankruptcy action.  (Dkt. #57).  The Court held a telephone conference with the parties to discuss whether, in light of this adversary proceeding, the automatic stay mandated by 11 U.S.C. § 362 extended to the instant matter.  The bankruptcy debtor, PCM, is not a party; neither party has requested that the stay be applied to this action; and neither party has argued that resolution of this action would have an immediate or inevitable adverse impact on the property of PCM's estate.  Consequently, the

Court finds that the stay does not apply to the instant matter, and this Court may decide the instant motion.  *Compare* 11 U.S.C. §§ 362(a)(1), (2) (noting that petition "operates as a stay" of a "judicial … proceeding against the debtor," and of "any act to obtain possession or property of the estate"), *with Queenie, Ltd.* v. *Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003) ("The automatic stay can apply to non-debtors, but normally does so only when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate."), *and In re 48th St. Steakhouse, Inc.*, 835 F.2d 427, 431 (2d Cir. 1987) (upholding stay as to non-debtor where action against it "would inevitably have an adverse impact on property of the bankrupt estate").

## DISCUSSION

### A.    Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted).  Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  "While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [a plaintiff's] claims across the line from conceivable to plausible.'"  *In re*

8

*Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Moreover, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Id.* at 663.

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco* v. *MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc.* v. *Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)); *see also Goel* v. *Bunge, Ltd.*, — F.3d —, No. 15-3023-cv, 2016 WL 1696597, at *2-3 (2d Cir. Apr. 28, 2016) (discussing materials that may properly be considered in resolving a motion brought under Fed. R. Civ. P. 12(b)(6)).

**B.      Analysis**

     **1.      Plaintiffs Have Standing to Bring the Instant Claims**

          **a.      Applicable Law**

Defendants argue preliminarily that Plaintiffs lack standing to bring any claim premised on Plaintiffs' rights as limited partners because such claims must be brought derivatively rather than directly.  (Def. Br. 20-21).  The inquiry for determining the nature of a claim against a limited partnership tracks that for determining the nature of claim against a corporation, which the Delaware Supreme Court set forth in *Tooley* v. *Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004).  The *Tooley* Court set forth two questions that courts must assess when classifying a claim as either derivative or direct: (i) who suffered the alleged harm, and (ii) who would benefit from recovery.  *Id.* at 1033.  Considering the first element, the "stockholder's claimed direct injury must be independent of any alleged injury to the corporation.... The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation." *Id.* at 1039.  Where a harm affects an entity as a whole such that individual investors suffer only "as a function of and in proportion to [their] *pro rata* investment in the [entity]," then the claim is derivative and must be pursued on behalf of the entity.  In regard to the second element, plaintiffs asserting a direct claim must show that they will directly benefit from any remedy.  *Id.* at 1033.

10

Additionally, application of the *Tooley* standard to limited partnerships may in some instances require more flexibility than is called for in the traditional corporate context.  This is because

> "[i]n the partnership context, the relationships among the parties may be so simple and the circumstances so clear-cut that the distinction between direct and derivative claims becomes irrelevant."  Similarly, in some instances, the relationships among the parties and the function and structure of the partnership itself may diverge from the corporate model so dramatically that some claims, which in a corporate context might be classified as derivative, must be brought as direct claims in order to enable the injured parties to recover while preventing a windfall to individuals or entities whose interests were not injured.

*Anglo Am. Sec. Fund, L.P.* v. *S.R. Glob. Int'l Fund, L.P.*, 829 A.2d 143, 150-51 (Del. Ch. 2003) (quoting *In re Cencom Cable Income Partners, L.P. Litig.*, 2000 WL 130629, at *3 (Del. Ch. Jan. 27, 2000)).

### b.   Analysis

Plaintiffs argue that they may bring the instant claims directly, because the asserted harms flow directly to Plaintiffs, as opposed to secondarily affecting Plaintiffs by virtue of their status as limited partners; and also because the composition of the partnership is such that a derivative action would be impracticable.  (Pl. Opp. 20-22).  The Court agrees.

First, Delaware courts recognize a direct cause of action for violation of a shareholder or partnership member's contractual rights where such rights are independent from rights held by the corporation or partnership as a whole. *Ruffalo* v. *Transtech Serv. Partners Inc.*, No. Civ. 5039-VCP, 2010 WL 3307487, at *9 (Del. Ch. Aug. 23, 2010) (citing *Kramer* v. *W. Pac. Indus., Inc.*, 546 A.2d

11

348, 351 (Del. 1988)).  Here, as the arbitrator explained in response to
Defendants' similar assertion that Plaintiffs lacked standing for their claims
against PCM, the General Partner "has a specific obligation under the [LPA] to
see that related party transactions [a]re performed at fair prices and with
independent scrutiny" — and, this Court additionally notes, to provide
accounting information to the limited partners.  (Compl. Ex. 5 at 46; Coleman
Decl. Ex. A).  Thus, to the extent that Plaintiffs' claims involve a breach of these
contractual duties, their claims are properly characterized as direct.  *See In re
El Paso Pipeline Partners, L.P. Derivative Litig.*, 132 A.3d 67, 88-89 (Del. Ch.
2015) (finding that where a party possesses a contractual cause of action, it
may sue directly to enforce it, even where the harm from the breach was not
particular to the suing party); *Allen* v. *El Paso Pipeline GP Co.*, 90 A.3d 1097,
1109 (Del. Ch. 2014) ("If a limited partnership agreement prohibits the actions
that were taken, then the limited partners have standing to enforce the limited
partnership agreement directly.").

Second, even were Plaintiffs' claims otherwise derivative in character, the
facts of the instant case, as alleged, counsel in favor of precisely the flexible
application of the *Tooley* test contemplated by the Delaware Chancery Court in
*Anglo American Security Fund.*  The Fund is asserted to have a very limited
number of investors, namely, Plaintiffs, Alpha Beta, and insiders affiliated with
Schepis and Canelas — and Alpha Beta has purportedly settled its claims for
breach of fiduciary duty and gross negligence against PCM, Schepis, and

12

Canelas.  (Compl. Ex. 4 ¶¶ 19, 26).[3]  Under such circumstances, any recovery to the Fund for Defendants' breach of their fiduciary duties would inappropriately benefit Defendants.  *See In re Cencom*, 2000 WL 130629, at *4 ("It is an elementary principle of equity that defendants found liable for breaches of either fiduciary duties or contractual arrangements should not benefit from any remedy for these breaches."); *see also Anglo Am. Sec. Fund*, 829 A.2d at 151.

Third, and relatedly, equity regards substance over form.  *Judah* v. *Shanghai Power Co.*, 494 A.2d 1244, 1249 (Del. 1985); *see also In re Cencom*, 2000 WL 130629, at *6.  Here, requiring the Plaintiffs to bring their claims derivatively would "exalt[] the partnership form over the substance of this intra-partnership dispute," *In re Cencom*, 2000 WL 130629, at *6, as the present litigation allegedly pits all remaining interests in the Fund against one another, rendering the distinction between direct and derivative action largely illusory.  Delaware courts have identified two primary purposes for requiring a claim to be brought derivatively: (i) to consolidate claims and ensure that any remedy accrues to the entity that sustained the harm, and (ii) to provide a "gatekeeping function," thereby promoting internal resolution of disagreements.  *Anglo Am. Sec. Fund,* 829 A.2d at 152; *accord McBeth* v. *Porges*, No. 15 Civ. 2742 (JMF), 2016 WL 1092692, at *10 (S.D.N.Y. Mar. 21, 2016).  The former of these

---

[3]     Defendants argue that there are in fact additional non-insider investors remaining to whom Defendants owe fiduciary duties.  (Def. Br. 8).  This is at best a contested fact not determinable on a motion to dismiss; moreover, while the fact that Plaintiffs plead their interest as functionally the only non-insider interest remaining in the Fund is certainly relevant to the question of standing, it is not, as the Court discusses in this section, the only consideration.

13

justifications actively counsels *against* characterizing the instant claims as derivative, insofar as a derivative action would merely divert a portion of any recovery to the alleged wrongdoer.  As for the latter purpose, the Partnership has been in "run-down mode" and no longer making investments since 2009 (Compl. ¶ 25), and Defendants maintain that Plaintiffs are in fact *no longer limited partners* (*see, e.g.*, Def. Br. 1 (describing Plaintiffs as "former investors" who "voluntarily withdrew as limited partners of the PCM Partnership"); Compl. ¶¶ 9, 56-59).  *See In re Cencom*, 2000 WL 130629, at *4-6 (finding the purposes of derivative actions no longer served where the enterprise was no longer ongoing, but rather had terminated and was in wind-up mode)*; McBeth*, 2016 WL 1092692, at *10 (finding that while mismanagement claims are typically derivative, plaintiffs' claim could be brought directly where the "Fund was dissolved and the only two members of the Fund … 'are now clearly adversaries'" (quoting *In re Cencom*, 2000 WL 130629, at *4)).  Consequently, requiring Plaintiffs to go through the formalities of bringing a derivative action would serve no beneficial purpose, but would instead only delay resolution of the instant matter.  For all of these reasons, Defendants' contention that the Complaint must be dismissed for lack of standing fails.[4]

---

[4]    Defendants additionally argue that Plaintiffs have acquired PCM, and that as a result, they cannot bring this suit because were their claims to persist, they would effectively be suing themselves.  (Def. Br. 12).  PCM has not, however, been named as a Defendant in the instant action.  Rather, the Complaint seeks liability against the managing members, Schepis and Canelas, in their individual capacity, and against PCM's successor as the Pursuit General Partner, Northeast.  (*See generally* Compl.).  Plaintiffs are therefore in no way "suing themselves," and Defendants' argument to the contrary fails.

## 2.    Certain of Plaintiffs' Claims Are Time-Barred

### a.    Applicable Law

Defendants further contend that Plaintiffs' "pre-arbitration" claims for breach of fiduciary duty and conversion are time-barred.  (Def. Br. 21; Def. Reply 7-9).  Under Delaware law, a three-year statute of limitations applies to causes of action for breach of fiduciary duty.  *In re Tyson Foods, Inc. Consol. S'holder Litig.,* 919 A.2d 563, 584 (Del. Ch. 2007); 10 Del. C. § 8106 (listing actions subject to a three-year limitations period).[5]  As a general rule, the statute of limitations for such a claim "begins to run when the cause of action accrues, not upon the Plaintiff's discovery of the injury."  *Houseman* v. *Sagerman*, No. Civ. 8897-VCG, 2015 WL 7307323, at *8 (Del. Ch. Nov. 19, 2015) (citing *Weiss* v. *Swanson*, 948 A.2d 433, 451 (Del. Ch. 2008)); *accord In re Tyson Foods, Inc.*, 919 A.2d at 584.  Under certain circumstances, however, the limitations period will be tolled: Tolling is appropriate where (i) discovery of a harm would be "practically impossible" at the time it occurred; (ii) defendants "fraudulently concealed from a plaintiff the facts necessary to put him on notice of the truth"; or (iii) plaintiff "reasonably relied upon the competence and good faith of a fiduciary."  *In re Tyson Foods, Inc.*, 919 A.2d at 584-85.  Even then, equitable tolling of the limitations period will extend only until a plaintiff receives inquiry notice.  In other words,

---

[5]    Plaintiffs' claim for breach of fiduciary duty is analyzed under Delaware law, pursuant to the LPA.  (*See* Coleman Decl. Ex. A § 13.03).  Plaintiffs' claim for conversion, on the other hand, is unrelated to the parties' rights and obligations under the LPA; Defendants assert, and Plaintiffs do not contest, that Connecticut law governs.  (*See* Def. Br. 20 n.19; Pl. Opp. 23; Def. Reply 9 n.10).  The Court therefore applies Connecticut law to Plaintiffs' conversion claim.

> no theory will toll the statute beyond the point where the plaintiff was objectively aware, or should have been aware, of facts giving rise to the wrong. Even where a defendant uses every fraudulent device at its disposal to mislead a victim or obfuscate the truth, no sanctuary from the statute will be offered to the dilatory plaintiff who was not or should not have been fooled.

*Id.* at 585 (citations omitted); *see also In re Dean Witter P'ship Litig.*, No. Civ. A. 14816, 1998 WL 442456, at *6 (Del. Ch. July 17, 1998), *aff'd,* 725 A.2d 441 (Del. 1999).

Plaintiff's conversion claim is similarly subject to a three-year limitations period. *Certain Underwriters at Lloyd's, London* v. *Cooperman*, 289 Conn. 383, 408 (2008) (citing Conn. Gen. Stat. § 52-577). The Connecticut Supreme Court has made clear, however, that, "[i]n construing [Connecticut's] general tort statute of limitations … [that court has] concluded that the history of [the] legislative choice of language precludes any construction thereof delaying the start of the limitation period until the cause of action has accrued or the injury has occurred." *Id.* (omission in original, quoting *Fichera* v. *Mine Hill Corp.*, 207 Conn. 204, 212 (1988)). Accordingly, Connecticut courts have found that § 52-577 is "an occurrence statute and that its limitation period does not begin 'when the plaintiff first discovers an injury.'" *Valentine* v. *LaBow*, 95 Conn. App. 436, 445-46 (2006) (quoting *Farnsworth* v. *O'Doherty*, 85 Conn. App. 145, 150 (2004)). Thus, unlike in the case of Plaintiffs' claim for breach of fiduciary duty, Plaintiffs need not have had inquiry notice of their conversion claim in order for the limitations period to have been triggered.

b.    **Analysis**

Defendants argue that Plaintiffs necessarily had knowledge of the facts underlying their conversion and breach of fiduciary duty claims more than three years prior to the filing of this action, as Plaintiffs asserted practically identical facts to those in the instant Complaint when they filed their Statement of Claim for arbitration on May 11, 2012.  (Def. Br. 21; Def. Reply 8-9).  Plaintiffs respond that PCM's withholding of information caused the relevant facts to go undiscovered until during or after arbitration, thereby placing the action within the three-year limitation period.  (Pl. Opp. 22-23).

There can be no question that Plaintiffs were on notice of certain facts underlying their breach of fiduciary duty claim more than three years before the filing of the instant action.  Plaintiffs' Statement of Claim for arbitration alleges that Schepis and Canelas engaged in a host of activities in violation of their fiduciary duties, including "[b]reaching explicit promises to return millions of dollars of capital to [Plaintiffs]"; "[i]mproperly using Partnership funds to pay or advance legal fees to defend the General Partner and the Insiders against an SEC investigation"; failing to honor record demands and "[r]efusing to provide any meaningful information, including proper financial reports and information about the Partnership's expenses, to [Plaintiffs]"; and "[p]urporting to unilaterally amend the Partnership Agreement to deprive [Plaintiffs] of significant rights under the Agreement."  (Compl. Ex. 4 ¶ 8).  Consequently, any claim Plaintiffs had arising out of those facts would be time-barred.

17

Plaintiffs argue, however, that certain of Defendants' actions either occurred or could only have been discovered at a later date: (i) the excessive mark-up of certain trades, in which PCM overpaid itself by $1.2 million; (ii) the diversion of 10 percent of the Lehman claim; (iii) the improperly inflated incentive fee and its subsequent improper distribution; (iv) Defendants' continued denial of Plaintiffs' current interest in the Fund; (v) Defendants' failure to release funds from the sale of the aircraft; and (vi) Northeast's transfer of $1,186,777 owed to Plaintiffs to counsel in the UBS Litigation.  (Pl. Opp. 23).  While some of these factual assertions are unlikely to support a valid claim, others suffice to plead a claim for breach of fiduciary duty within the limitations period.

The Statement of Claim for arbitration indicates that Plaintiffs had inquiry notice of diversion of 10 percent of the Lehman claim prior to arbitration.  Plaintiffs stated in that document that "[w]ithout providing any supporting information, the General Partner asserted that [an] Offshore Fund owned 10% of the Lehman claim." (Compl. Ex. 4 ¶ 46).  The Offshore Fund at issue was, according to Plaintiffs' "information and belief" at that time, "also run by the Insiders." (*Id.* at ¶ 22).  It may be that Plaintiffs' belief regarding the improper splitting of the Lehman claim was not *confirmed* until March 2013; but by their own account, they believed, as of May 11, 2012, that 10 percent of the Lehman claim had been siphoned off to an offshore fund run by Insiders with no valid explanation.  On such facts, Plaintiffs' clearly had "inquiry notice" of any claim based on the allocation of the Lehman claim.

18

The same can be said for Plaintiffs' claim regarding Defendants' failure to release funds from the aircraft sale: Plaintiffs' May 11, 2012 filing expressly alleged (i) the sale of the airplane for inadequate consideration, and (ii) Defendants' subsequent refusal to "follow through and distribute" funds representing the full value of Plaintiffs' interest in the Partnership — which would presumably include Plaintiffs' share of the proceeds from the aircraft sale.  (Compl. Ex. 4 ¶ 44).  Hence Plaintiffs' claim for conversion relating to that transaction is time-barred, as is any claim for breach of fiduciary duty arising out of the same facts.[6]

Plaintiffs were not, however, necessarily on notice of every bad act they attribute to Defendants in their Complaint, and some of those acts may, independently, suffice to state a claim for breach of fiduciary duty.  For instance, while the trades for which Plaintiffs allege excessive mark-ups occurred in 2007, the arbitrator found that Plaintiffs had no inquiry notice until "late 2012"; this creates, at the very least, a contested issue of fact regarding when Plaintiffs were chargeable with knowledge of the mark-ups. (Compl. Ex. 5 at 44).  As for the incentive fees, the dispute over the fees' propriety was indeed raised prior to arbitration, indicating that Plaintiffs were on notice of their claim as it relates to the fees' excessive accrual (*id*. Ex. 4 at ¶¶ 51-53); to the extent that Plaintiffs assert breach of fiduciary duty based on

---

[6]     Plaintiffs argue that their conversion claim is not time-barred because the failure to distribute the sale proceeds occurred within the three-year limitations period, even if the sale itself did not (Pl. Opp. 23); but this characterization of events is belied by the Statement of Claim for arbitration, which plainly states that after the sale, Defendants refused to payout Plaintiffs' interest in the Fund (Compl. Ex. 4 ¶ 44).

the *distribution* of the fees, however, that did not occur until January 2013  (*id.* at ¶ 36; Ex. 7).  Moreover, counsel for Defendants represented to Plaintiffs prior to arbitration that the fee was no more than an accrual, and that no disbursement would occur until the dispute over accrual had been resolved by the arbitrator.  (*Id.* at ¶ 36; Ex. 5 at 32).  Under these circumstances, Plaintiffs have raised a question of fact regarding the timeliness of a fiduciary duty breach claim predicated on the miscalculated incentive fee.

Considering next Defendants' refusal to acknowledge Plaintiffs' interests in the Fund, the decision of the arbitrator indicates that Plaintiffs first received notice that they "were being mandatorily withdrawn from the Partnership," and therefore could no longer assert an interest in the Fund, on September 27, 2012 — placing the denial of their interest within the three year period. (Compl. Ex. 5 at 32).  Finally, the transfer of $1,186,346.38 owed to Plaintiffs occurred on June 30, 2014, well within the statute of limitations.  (*Id.* at ¶¶ 54-55).

The Complaint alleges a laundry list of wrongs committed by Defendants, some of which fall within the limitations period and some of which do not. Because the events supporting Plaintiffs' claim for conversion of the Fund's airplane occurred more than three years prior to the instant litigation, that claim is time-barred.  However, as the foregoing illustrations indicate, Plaintiffs have alleged sufficient predicates for their breach of fiduciary duty claim that either fall within the limitations period or are potentially subject to tolling, such

20

that the Court cannot, as a matter of law, find their breach of fiduciary duty claim to be time-barred at this stage.

### 3. The Preclusive Effect of the Prior Related Arbitration Must Be Submitted to the Arbitrator

#### a. Applicable Law

Defendants principally argue that the present action is precluded by the prior arbitration under the doctrine of *res judicata*.  (Def. Br. 13; Def. Reply 5-7).[7]  Plaintiffs respond that *res judicata* does not bar the instant claims, and that in any event, the preclusive effect of the prior arbitration should be decided by the arbitrator.  (Pl. Opp. 8-13).  Plaintiffs' assertion that the issue of *res judicata* should be submitted to the arbitrator raises two questions: the arbitrability of Defendants' *res judicata* defense, and the proper party (as between the Court and the arbitrator) to decide that threshold question of arbitrability.

Because the LPA, which contains the arbitration clause, establishes a partnership for the purpose of investment activity occurring in interstate commerce, it is governed by the Federal Arbitration Act (the "FAA").  *See* 9 U.S.C. § 2; *Citizens Bank* v. *Alafabco, Inc.*, 539 U.S. 52, 56 (2003) (interpreting FAA's "involving commerce" language as signaling "the broadest permissible exercise of Congress' Commerce Clause power," such that the FAA applies to all transactions "*affecting* commerce" (emphasis added)).  State law

---

[7]     *See generally TechnoMarine SA* v. *Giftports, Inc.*, 758 F.3d 493, 498 (2d Cir. 2014) ("A court may consider a *res judicata* defense on a Rule 12(b)(6) motion to dismiss when the court's inquiry is limited to the plaintiff's complaint, documents attached or incorporated therein, and materials appropriate for judicial notice.").

applies to determine whether parties have obligated themselves to arbitrate certain issues, including the question of arbitrability; nevertheless, the FAA dictates that in determining whether a claim or defense should be submitted to arbitration, "the federal policy in favor of arbitration requires that 'any doubts concerning the scope of arbitrable issues' be resolved in favor of arbitration." *Shaw Grp. Inc.* v. *Triplefine Int'l Corp.*, 322 F.3d 115, 120 (2d Cir. 2003).

Federal courts have recognized an exception to this policy, however, when ruling on arbitrability:  "[T]he issue of arbitrability may only be referred to the arbitrator if there is *clear and unmistakable evidence* from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator.'" *Bell* v. *Cendant Corp.,* 293 F.3d 563, 566 (2d Cir. 2002) (emphasis in original) (internal quotation marks omitted); *accord Shaw Grp. Inc.*, 322 F.3d at 121. Similarly, Delaware law holds that "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did so."  *McLaughlin* v. *McCann*, 942 A.2d 616, 621-22 (Del. Ch. 2008) (quoting *First Options of Chicago, Inc.* v. *Kaplan*, 514 U.S. 938, 944-45 (1995)).

### b.    Analysis

Plaintiffs assert that, pursuant to *Citigroup, Inc.* v. *Abu Dhabi Investment Authority*, 776 F.3d 126 (2d Cir. 2015), and *National Union Fire Insurance Co. of Pittsburgh* v. *Belco Petroleum Corp.*, 88 F.3d 129 (2d Cir 1996), the arbitrator should determine the preclusive effect of his prior Awards.  (Pl. Opp. 12).

Because the Court finds, however, that the antecedent question of arbitrability should be determined by the arbitrator, it does not consider the merits of Plaintiffs' argument.[8]

The arbitration clause contained in the LPA states that "ANY CONTROVERSY BETWEEN THE PARTNERSHIP AND ANY PARTNER OR BETWEEN ANY PARTY HERETO ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE BREACH THEREOF SHALL BE SETTLED EXCLUSIVELY BY ARBITRATION IN ACCORDANCE WITH THE RULES THEN IN EFFECT OF THE COMMERCIAL DIVISION OF THE AMERICAN ARBITRATION ASSOCIATION."  (Coleman Decl. Ex. A § 13.04 (capitalization in original)).  The Delaware courts have "adopt[ed] the majority federal view that reference to the [AAA] rules evidences a clear and unmistakable intent to submit arbitrability issues to an arbitrator."  *James & Jackson, LLC* v. *Willie Gary, LLC*, 906 A.2d 76, 81 (Del. 2006).  The Delaware Supreme Court has additionally clarified that arbitrators need not "decide arbitrability in *all* cases where an arbitration clause incorporates the AAA rules," but rather only "in those cases where the arbitration clause generally provides for arbitration of all disputes and also incorporates a set of arbitration rules that empower arbitrators to decide arbitrability."  *Id.* (collecting cases) (emphasis in original).

---

[8]    Defendants ask that, should the Court determine that the *res judicata* inquiry is properly committed to the arbitrator, the Court stay the instant matter and submit to arbitration only the "single issue" of whether claims against Schepis and Canelas could have been brought in the prior arbitration.  (Def. Br. 7).  To the extent Defendants are asking the Court to circumscribe the arbitrator's ability in a manner contrary to the law set forth in the text of this Opinion, the Court declines to do so.

Here, the arbitration clause requires "any controversy ... between any party hereto arising out of or relating to [the] agreement" to be arbitrated.  This constitutes precisely the sort of agreement to arbitrate "all disputes" contemplated in *James & Jackson*.  906 A.2d at 81 (citing, e.g., *Terminix Int'l Co., LP* v. *Palmer Ranch LP*, 432 F.3d 1327, 1329 (11th Cir. 2005) (arbitration clause covered "any controversy or claim... arising out of or relating to" the agreement); *Contec Corp.* v. *Remote Solution Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005) (arbitration clause covered "any controversy arising with respect to this Agreement"); *Citifinancial, Inc.* v. *Newton*, 359 F. Supp. 2d 545, 549 (S.D. Miss. 2005) (arbitration clause provided that "any Claim ... shall be resolved by binding arbitration")).  The claims asserted by Plaintiffs derive from their rights as limited partners to the LPA, and consequently "arise out of" or "relate to" that Agreement.  The broadly sweeping agreement to arbitrate all such claims, paired with the explicit incorporation of the AAA's rules, places the arbitrability of Defendants' preclusion defense within the scope of matters properly committed to arbitration.[9]

---

[9]    In light of the Court's decision to refer the remaining claims in this case to the arbitrator to consider the issues of arbitrability and *res judicata*, the proper course of action is for the Court to stay this matter during the period of referral.  *Katz* v. *Cellco P'ship*, 794 F.3d 341, 345 (2d Cir.), *cert. denied*, 136 S. Ct. 596 (2015).

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss Plaintiffs' conversion claim is GRANTED.  The Court compels arbitration of the arbitrability of Defendants' *res judicata* defense; Plaintiff's remaining claims against Defendants are therefore STAYED pending resolution of arbitration proceedings.  In light of the stay, Defendants' motion to dismiss Plaintiffs' remaining claims is DENIED WITHOUT PREJUDICE.  The parties shall submit a joint letter to the Court by **September 9, 2016**, and every four months thereafter, updating the Court on the status of arbitration proceedings.

The Clerk of Court is directed to terminate Docket Entries 26 and 41.

SO ORDERED.

Dated:      May 10, 2016
            New York, New York

                                   _____
                                         KATHERINE POLK FAILLA
                                        United States District Judge